ODOM, J.
 

 Plaintiff was engaged in the naval stores business in New Orleans, where ,it kept in its yards a stock of turpentine, rosin, pine tar, and pitch. It carried an open policy of marine insurance on said stock in the Franklin Fire Insurance Company, amounting to $125,-OOO, which policy insured it against loss by various perils, fire being one of them.
 

 On April 12, 1928, plaintiff’s yards were visited by fire which destroyed a large portion of its stock and damaged some of that which was not consumed. Following the fire, plaintiff made out proofs of loss claiming loss and damage amounting to $95,292.96. The insurance company admitted liability under the policy, but disputed the amount of the claim, and employed experts to make an independent investigation of the loss and to make report to it. These experts, after working more than a month, reported that plaintiff’s loss amounted to $42,548.09, which amount' the insurance company paid without prejudice and with full reservation by plaintiff of its right to sue for whatever balance it might claim.
 

 Plaintiff originally claimed that its loss amounted to $95,292.96, but, on further cheek, it reduced its claim to $83,623.65. Giving the insurance company credit for the $42,548.00 paid, its claim was reduced to $41,075.56. The present suit is for that amount. Plaintiff obtained judgment for $662.49, and appealed.
 

 1. Section 19 of the insurance policy reads as follows:
 

 “Merchandise in yards, etc., is insured at the value prevailing on the day preceding the current daily market value quoted at Savannah, Jacksonville or Pensacola, for merchandise located in said locations as the case may be, and in all other places not mentioned the Savannah market quotation is to apply,
 
 but the insured, is privileged to declare by mail or otherwise to this company a higher valuntion before arty known or reported loss of casualty.”
 
 (Italics ours.)
 

 The property destroyed and damaged was located in New Orleans, and it is not disputed by plaintiff that, in the absence of the exercise of its privilege to declare a higher value prior to the. date of the loss, the value of the products as quoted at Savannah would
 
 *555
 
 prevail for the purpose of adjusting the loss. Nor is it denied by defendant that, if plaintiff did declare a higher value previous to the loss, the value so declared should prevail.
 

 In making out its claim for the loss sustained, plaintiff placed a value on its goods far in excess of the Savannah quotations. It did this upon the theory that it had, previous to the date of the loss, declared by mail to the defendant company a higher value on its stock. Defendant contends that no declaration of a higher value was made to it within the meaning of the policy, and for that reason it adopted the Savannah quotations in making its estimate of the loss.
 

 2. This was an open marine policy, and the premiums charged by the insurance company ivere based upon the gross value of the stock carried by the assured, the policy specifically providing that “said premium to be arrived at by dividing the aggregate daily values of merchandise at risk by the number of days in the month and then calculating the results at above rates,” etc. The policy further-stipulated that “reports of merchandise in naval stores yards, etc., to 'be made monthly.”
 

 The plaintiff company made these reports regularly, and sent them by mail to the company or its agents, and it is admitted that they- were received. These reports are referred to by counsel as the “yellow sheets.” We have them before us, have examined them, and find that they show merely the gross value of the turpentine, rosin, pine tar, and pitch on hand without designating the quantity of the respective products. Referring to the report made on April 11, 1928. the day before the fire, we find that it shows turpentine on hand on that date valued at $67,621, rosin valued at $18,292, pine tar valued at $26,208, pitch valued at $3,150 and barrels and drums valued at $3,837, a total of'$118,608.
 

 In arriving at these figures, plaintiff used its own valuation based, as we understand, on the original cost of the goods, some of which had been on hand for approximately a year, plus ordinary overhead expenses and legitimate profits.
 

 While it was charged in defendant’s answer that “the claim made by plaintiff in said document (referring to plaintiff’s report of its loss and damage made to the insurance company after the fire) is false find exaggerated,” we must, in justice to plaintiff, absolve it from all imputation of fraud or intentional misrepresentation as to the value of its stock. Its report to the insurance company was based upon its inventory and what it considered a reasonable value of its goods. Nor do we think the record warrants the suggestion made by counsel for the insurance company that the gross value of the stock on hand as shown by the “yellow sheets,” to which we have referred, was inflated by the plaintiff to bolster its credit standing with the banks.
 

 But, for the purpose of adjusting its loss with the insurance company, plaintiff cannot substitute its own values for those which the policy specifically provides shall be used, because it did not prior to the loss, “declare by mail or otherwise to this company a higher valuation” than the Savannah quotations. The making out and mailing to the company of the “yellow sheets” did
 
 *557
 
 not meet the requirements of the policy. All that was shown by those sheets or reports was the gross value of the stock on hand. There was nothing on them to show what quantity of the various products plaintiff had on hand, and therefore no way by which defendant could have determined the price per gallon of the turpentine, the price per barrel of tar or pitch, etc. There was nothing in the reports to indicate that plaintiff intended to declare a higher value on its goods than the market quotation.
 

 The word “value,” as used in section 19 of the policy quoted above, does not mean the gross value in lump of all the stock on hand. It means the value per unit of the various kinds of goods on hand as they are quoted in the markets and exchanges. To illustrate, turpentine is quoted at so much per gallon, tar and pitch at so much per barrel, etc., just as cotton is quoted at so much per pound and grain at so much per bushel.
 

 The purpose of inserting section 19 into the policy was to fix a certain and equitable basis on which settlements might be made in case of loss. It prevents the insurance company from taking advantage of the insured by underestimating the value of the stock and the insured from inflating it. It substitutes certainty for uncertainty, does away with disputes and arbitrations. It is fair to both parties. It gives the insured the privilege of declaring and thereby fixing a higher value on the goods covered which declaration and fixing of value is binding upon the insurer. But the intent of the insured to fix a higher value than the market or quoted value of the goods must be made known to the insurers in certain, specific terms,, or, to say the least, some information must be conveyed which is sufficient to put the insurer on notice. No such intention was indicated- by the reports made by plaintiff.
 

 The rule is well established that insurance contracts are generally to be construed against the insurer, and that a liberal interpretation o'f clauses therein exempting or limiting their liability is not permitted, Finley v. Mass. Life Ins. Co., 172 La. 477, 134 So. 399, and authorities there cited.
 

 Learned counsel call our attention to this rule, and say it should be applied in the construction of section 19 of the policy above quoted. We think the rule has no application here, for the reason that the evident purpose of that section was neither to exempt the insurer from liability nor to limit its liability, but rather to establish a rule by which the extent of its liability in case of loss might be determined. Plaintiff, the insured, was'familiar with this part of the insurance contract, and is bound by it. In fact, plaintiff invokes part of its provisions by claiming that it did in fact declare a higher value, on its goods.
 

 3. Counsel for plaintiff suggest that defendant is estopped to dispute the value placed upon its goods because, it is claimed. J. B. Ross was defendant’s agent, and that Ross had knowledge of the value placed upon the goods. There is considerable testimony pro and con as to whether- Ross was defendant’s agent. We find it unnecessary to decide that point, for the reason that, if it' be true that he was defendant’s agent, the situation would not be changed. All the informa
 
 *559
 
 tion Ross had as to the value placed upon the goods by plaintiff prior to the loss was that conveyed by the so-called “yellow sheets,” and said sheets, as we have said, did not convey notice that plaintiff intended to declare a higher value on the goods than the market value as quoted at Savannah.
 

 4. On
 
 the merits there is involved a voluminous mass of testimony given principally by experts on naval stores affairs, tnose whose business it has been for many years to survey and estimate losses of this kind. The figures and calculations made by the chemists and the certified public accountants are bewildering. After going through the entire record and examining the numerous exhibits filed, our conclusion is that no useful purpose whatever would be subserved by repeating the testimony in detail. We shall therefore do no more than state the substance of that which we think is controlling.
 

 The case is, to a large extent, disposed of by our holding that, as to the value of the goods destroyed, the' Savannah quotations must prevail. In making out its claim, plaintiff took into consideration what it had paid for the stock it had on hand, some of it having been purchased more than a year previous to the fire. It is shown that the market had been steadily declining for some time, and for that reason plaintiff averaged the prices paid and in that way arrived at the figures shown on its report to the defendant as its proof of loss. It had paid, for instance, as much as ?1 a gallon for some of the turpentine it had on hand. In estimating its loss, it valued its entire stock at 70 cents, which was approximately 20 cents above the Savannah quotations. This discrepancy alone makes a vast difference between the amount claimed and that which is actually due.
 

 Aside from the goods totally destroyed, some of the stock was damaged, and there is dispute as to the extent of this damage. This dispute arises mainly from the fact that the respective sides adopted wholly different methods of arriving at the extent of the damage to goods not totally
 
 destroyed.
 
 Plaintiff took charge of what was left, claiming that it was not merchantable in its then condition, “reconditioned” it, sold some of the reconditioned products in New Orleans, shipped a small quantity to Cuba, kept some for itself, and used some of the turpentine, the exact amount not being stated, in reconditioning the tar. It charged the insurance company with all expenses thus incurred, and gave credit for the amount realized from the sales, and also allowed credit, at a price fixed by it, for the goods it retained.
 

 Defendant pursued a different method. Immediately after the fire, it employed experts to estimate the damage. They ascertained the-total amount of goods on hand before the fire from an examination of plaintiff’s books or-an audit of them. They measured the turpentine and counted the barrels and drums of tar and pitch which they found, and in that way were enabled to tell what was totally destroyed.
 

 In computing the value of that which was destroyed, they took the Savannah quotations. They took samples of the turpentine which they found in tank cars and had them analyzed by a chemist in order to determine whether it had been damaged by the fire. They examined the tar, rosin, and pitch for
 
 *561
 
 the same purpose. They found the major portion of it undamaged. Their final report was that plaintiff’s total loss, including the value of the goods destroyed and the damage to that which remained, was $42,549.09, which ampunt the insurance company paid.
 

 Plaintiff had on hand at the time of the fire, according to its books, 77,845 gallons of turpentine. There is no dispute as to the quantity, nor is there any dispute as to the quantity destroyed. The controversy over this item is whether that which remained was damaged by the fire, and, if so, to what extent.
 

 Our conclusion is that it was not damaged, and our reasons for so holding briefly are these: More than 18,000 gallons were in three tank cars on side tracks in plaintiff’s yards. Samples of each of the cars were taken to a chemist, Dr. Leipsner, for analysis. He found that it was of low grade due to its adulteration with mineral oil, which is cheaper than turpentine. That was all he found wrong with it. He did not know, of course, how or when the mineral oil got into it, but the fire had nothing to do with that. This turpentine was in the tank ears at the time of the fire, but there is no testimony to show how close these ears were to the fire, and therefore nothing to show that it was heated. The testimony of this chemist was not challenged by plaintiff. In our opinion, it is fatal to plaintiff’s pretensions that the turpentine was. damaged by the fire, and, if it was not damaged, plaintiff has no claim, except for that which was destroyed, and that is conceded and has been paid.
 

 Plaintiff, while- claiming that all the turpentine left on the yard was damaged by the fire, utterly failed to prove it. He did not have any' of it analyzed chemically, and that, according to the witnesses, is the only test as to whether it is good or bad. Defects in turpentine cannot be detected either by the sense of sight or smell.
 

 Plaintiff and his witnesses, Mr. Meriwether and Mr. Dusenberry, said it was not merchantable. The chemist said so too, but the reason he gave was that it contained mineral oil and that was not due to the fire.
 

 Now as to the tar: There is no- dispute as to the quantity of tar on hand at the time of the fire nor as to what was destroyed. That which was destroyed was paid for at Savannah prices. Plaintiff says that which remained was badly damaged; that it eon•tained water and was granulated. It did contain water, and there was some granulation, but the fire did not necessarily cause those conditions. The testimony of all the witnesses, chemists and naval stores experts, is to the effect that all pine tar contains water in “suspension,” -that is, so mixed with the tar that its presence is not observable, and that, when the tar is" put into a container, the water separates arid can be drained off. The practice is to put the tar in drums or barrels, leave the bung open, and later bleed the water out through a faucet. Mr. Reed, station agent at Folsom, from which point some of this tar was shipped by Mrs. McLean to plaintiff, saw them draining water from the containers while they were at the station. Mr. Spring testified that such was the practice. Mr. H. M. Shilstone, an analytical chemist and chemical engineer called by plaintiff, said that, when tar is put on the
 
 *563
 
 yards, they bleed it to get rid of the water.
 

 He and other witnesses testified that some water naturally accumulates in the containers. Expert witnesses say that heat does not cause the water to separate from the tar while there is some testimony to the contrary.
 

 As to granulation, the testimony preponderates in favor of the theory that it is caused by age and not by heat, and there is abundant testimony that, if this tar had become so heated as to produce any change, the containers would have blown up. Some of these near the fire did burst, but they were counted as total loss and paid for.
 

 Some of the pitch and rosin was destroyed. This was paid for by defendant. Some of the containers of tar, pitch, and rosin were damaged, but, in all cases of damage, allowance was made for it by defendant.
 

 No useful purpose would be subserved by commenting on plaintiff'^ evidence. It suffices to say that we think the method pursued by it in fixing its damage was wrong. It should have had the turpentine and other products more critically examined. We have only Mr. J. P. Rausch’s testimony that these products were badly damaged by the fire. That of Mr. Meriwether and Mr. Dusenberry does not help him. They did not examine the goods with any degree of care, and had no way of knowing definitely that the goods were damaged.
 

 The district judge accexxted the calculations made by defendant’s witnesses and we sustain his findings.
 

 The judgment appealed from is correct, and is affirmed with all costs.